**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
IMIG, INC.,

                        Plaintiff,

       - against -

ELECTROLUX HOME CARE
PRODUCTS, LTD.,

                    Defendant.
---------------------------------------------------------X

                     **MEMORANDUM**
                     **AND ORDER**

                     CV 05-0529 (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

      Plaintiff Imig, Inc. ("Imig") accuses defendant Electrolux Home Care Products, Ltd. ("Electrolux") of improperly disparaging its products – commercial vacuum cleaners known as the "Perfect P101" and "Perfect P102" (collectively, the "Perfects") – by telling people in their shared industry that the latter are unlawful copies of Electrolux's own vacuums – the "Sanitaire" models 866 and 899 (collectively, the "Sanitaires"), respectively – and thereby interfering with Imig's business relationships. Docket Entry ("DE") 1. Electrolux has responded with counterclaims charging that Imig and its distributor, Nationwide Sales & Service, Inc. ("Nationwide") (collectively, "I&N") deliberately and unlawfully imitated the design of its Sanitaire vacuum cleaners and distributed as its own verbatim copies of the relevant Owner's Guide. DE 5. Both sides now seek summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Specifically, I&N ask for summary judgment in their favor on all of Electrolux's claims against them but do not ask that I enter judgment on their own affirmative claims against Electrolux. Electrolux has cross-moved for summary judgment in its favor on all of the claims in this case, both defensively with respect to Imig's claims against it, and offensively with respect to its counterclaims. For the reasons explained below, I grant Electrolux's motion in part and deny it in part, and I deny Imig's motion in its entirety.

# I. Background

## A. Factual Background

The following facts are drawn from the statements that the parties submitted in compliance with Local Civil Rule 56.1, and are uncontested except where otherwise noted.

### 1. The Parties

Mark and Scott Genoa, brothers, are joint owners, officers, and directors of Imig and Nationwide. Def. Loc. Civ. R. 56.1. Stmt., DE 53 ("Def. Stmt.") ¶ 25. Nationwide is a distributor of cleaning supply products, including vacuum cleaners, and has been in business since 1996. *Id.* ¶ 26. Sometime after Nationwide's formation, and probably in 2003, Mark and Scott Genoa formed Imig. *Id.* ¶¶ 28-29. Imig sells vacuum cleaners; at issue here are the P101 and P102 models manufactured under the "Perfect" mark. *Id.* ¶ 3. Nationwide and other distributors buy the Perfect vacuum cleaners from Imig and other suppliers, and sell them to the public. Nationwide was an authorized distributor of Sanitaires until 2005. Def. Stmt. ¶ 94; Pl. Loc. Civ. R. 56.1 Statement, DE 41 ("Pl. Stmt.") ¶ 27.[1]

Defendant Electrolux Home Care Products, Ltd. is the successor company – after several mergers and other corporate transformations – to The Eureka Company. Def. Stmt. ¶¶ 1-7. Electrolux makes the Sanitaire 886 and 899 vacuum cleaners and sells them under the "Electrolux" mark. It also manufactures vacuum cleaners bearing some degree of similarity to the 866 and the 899, and sells these "private label" machines to others for sale under their own brand names. *Id.* ¶ 10. For all of its vacuum cleaners, Electrolux manufactures original and replacement parts. *Id.* ¶ 9.

---

[1] I&N do not contest the assertion that the business relationship with Electrolux ended in 2005, but assert that Nationwide continues to sell vacuums manufactured by Electrolux by purchasing them from other distributors. Pl.'s Resp. to Def. Stmt., DE 47 ("Pl. Resp.") ¶ 94.

2. <u>The Vacuum Cleaners</u>

Late in 2002, the Genoa brothers decided to manufacture vacuums. Def. Stmt., Ex. 18 (Mark Genoa Dep. 116:11-116:23, Sept. 7, 2005). Relying on their experience of the marketplace, they "tried to take the best of all the machines" that they considered to be "good sellers." *Id.* (Mark Genoa Dep. 123:18-20). Precisely how they went about doing so is in dispute: according to Elexctrolux, rather than create documents or draw up specifications, the Genoa brothers "came up with all the ideas," and transmitted them to manufacturers in China – who had Sanitaire vacuums on hand for reference – for further development. Def. Stmt. ¶¶ 106-10. I&N contest this assertion, claiming that although the brothers came up with the ideas, "all the other development work was performed in China" and that development documents existed in China. Pl. Resp. ¶¶ 102, 106. I&N have not produced any evidence of the existence of other development documents.

Electrolux claims that even the most cursory visual inspection demonstrates that the Perfects are unlawfully similar in appearance to the Sanitaires, and moreover, that I&N deliberately infringed on Electrolux's rights in the Sanitaires. Each Sanitaire is an upright commercial vacuum cleaner with the words "HEAVY DUTY COMMERCIAL" in white lettering prominently affixed to a red hanging bag. Def. Stmt., Ex. 15, 16. The base assembly is red with a chrome hood out of which motor vents are cut; on the 899, the chrome hood is topped by a small red and white fixture. *Id.* On the 886, the base assembly takes a roughly trapezoidal shape, with the front somewhat wider than the back. Def. Stmt., Ex. 15. The 899 base assembly differs somewhat: rather than a gradual widening from back to front, the base assembly widens sharply approximately three-quarters of the way from back to front, such that the front quarter of the base assembly appears to be a rectangle perpendicular to the base itself. Def. Stmt., Ex. 16.

Both have a black knob affixed to a black plate on the front of the base assembly, with writing and other marks on the knob and the plate in white. Def. Stmt., Ex. 15,16. Above the knob, the word "Sanitaire" is displayed in white lettering, with a red design to the left of the word. *Id.* At the back of the base assembly, the power switch sits atop the chrome hood. *Id.*

Like the Sanitaires, the Perfect P101 and P102 models are upright vacuum cleaners with the words "HEAVY DUTY COMMERCIAL" in white lettering prominently displayed in the top right corner of the hanging bag. Def. Stmt. ¶¶ 176, 184.[2] The hanging bag on the Perfect vacuums is dark blue, as is the base assembly. Def. Stmt., Ex 15, 16. Both models of Perfect vacuum cleaners have a chrome hood, on top of which – and at the back of the base assembly – sits the power switch. Def. Stmt. ¶¶ 175, 183. The shape of the base assembly for the P101 and P102 is the same as that of the 866 and 899, respectively. Def. Stmt. ¶¶ 171, 179. In black capital letters, the word PERFECT is written above the knob and to the right of an American flag on the base assembly of both Perfects; the parties disagree about the prominence with which the word is displayed. Pl. Stmt. ¶ 17; Def. Resp. to Pl. Stmt., DE 57 ("Def. Resp.") ¶ 17.

On May 22, 2003, on behalf of the Genoa brothers, Leonard Holz sought information about the existence of design or utility patents pertaining to the 886 and 899 vacuums, whether or not expired. Def. Stmt., Ex. 32 (Letter from Leonard Holtz dated May 22, 2003).[3] Mr. Holz explained that his client "wishe[d] to make a private label vacuum cleaner that is virtually

---

[2] In response to Electrolux's assertions about the appearance of the Perfect vacuums, I&N object that this component of the vacuum cleaners is not a feature of trade dress, is used by others, and is no longer a feature of vacuum cleaners manufactured by Imig or distributed by Nationwide. Other than this contention, I&N do not contest the substance of Electrolux's statements. Pl. Resp. ¶¶169-185.

[3] The letter itself makes no reference to the Genoas, Imig, or Nationwide. However, Electrolux asserts that I&N decided to "knock off" the machines at issue, citing this letter, and I&N do not contest that statement. Def. Stmt. ¶ 96; Pl. Resp. ¶ 96.

identical in appearance (and perhaps also mechanically identical)" to the Sanitaires.  *Id.* at 1.

From this and the similarities between the vacuums, Electrolux concludes that I&N intentionally

and unlawfully imitated the Sanitaires.

### 3.    The Owner's Guides

Owner's Guides accompanying at least the first 400 Perfect vacuum cleaners were

"virtually identical" to Electrolux's copyrighted Owner's Guide.[4]  Def. Stmt. ¶ 120. The text and

illustrations are the same, down to the capitalization of the headings for each topic addressed.

*Id.* ¶¶ 121-26.  Mark Genoa admitted that the I&N Owner's Guide was a copy of the one

produced by Electrolux.  *Id.* ¶ 128.  I&N deny that they or their principals had any role in or

knowledge of the creation of the I&N Owner's Guide.  *See id*. ¶ 127; Pl. Resp. ¶ 127.

### 4.    I&N's Statements

I&N solicited purchasers for the Perfect vacuum cleaners by advertisements in print

form.[5]  Def. Stmt. ¶¶ 215-221.  These advertisements contain multiple claims about the quality

of the Perfects and their comparative quality with respect to other vacuum cleaners.  *Id.*

Specifically, the advertisements claim that the Perfects have three times the motor life and 30%

more strength than their "nearest competitors" and that the motor is 9.5 amperes.  *Id.*  Like the

Perfects themselves, all of the advertisements bear a legend indicating that the vacuums have

been tested by ETL, a company that performs tests on machinery to ascertain compliance with

various industry standards.  *Id.*  One advertisement, circulated in August 2005, draws explicit

---

[4] The extent to which the parties' dispute is confined to those first 400 vacuums has not been discussed and is not before me at this time.

[5] I&N argue that the evidence shows only that at some point they published the challenged advertisements and not that they currently publish the advertisements but do not otherwise contest these assertions.  Pl. Resp.  ¶¶ 215-221.

comparisons between the Perfect P101 and the Sanitaire 866, exhorting the reader to "Accept No Substitutes" and claiming that several of the P101's features demonstrate its superiority over the 866. Def. Stmt., Ex. 53.

Electrolux challenges all of these assertions as literally false, contending that the Genoa brothers deliberately propagated misleading information. ETL conducted two sets of tests on the Perfects, neither of which measured the motor life or the amperage of the motors independently of the vacuums. Def. Stmt. ¶ 233. One test was performed under the "UL 1017" standard, which tests vacuums as a whole. *Id.* ¶ 234. This test measured the amperage of the vacuum as a whole, under "normal load conditions," and conditions simulating normal use. *Id.* ¶¶ 292-98. Imig reported the power of each vacuum to be 870 watts, or 7.4 amperes. *Id.* ¶¶ 309-10, 322. ETL concluded that the P101's measured power was 800 watts and that the P102's measured power was 900 watts, deviations that were within acceptable bounds. *Id.* ¶¶ 307-10. ETL performed a second set of tests under the UL 1004 standard because the results of the first test identified motors that had not been approved or recognized by the Nationally Recognized Testing Laboratory. *Id.* ¶¶ 234, 236-37. The purpose of this set of tests was to approve the motors for use in the Perfects, but did not involve any testing of the motors' power. *Id.* ¶¶238, 269. These were the only tests that ETL performed on the Perfects; ETL never performed tests on motor life, independent motor amperage, and comparisons with the Sanitaires. *Id.* ¶¶ 244.

5.      Electrolux's Statements

When it filed the complaint to commence this action, Imig claimed that it had suffered harm because of certain statements it attributed to Electrolux. Specifically, Imig charged that Electrolux had informed individuals throughout the industry that the Perfects infringed on the

Sanitaires and that anyone who purchased the Perfects would be sued along with Imig. Def. Stmt. ¶ 392. None of Imig's employees ever saw such statements in writing. *Id.* ¶ 397.

When pressed, Imig identified seven individuals who it claimed had purportedly heard or otherwise become aware of the statements attributed to Electrolux and who, together with another individual, had refused to place orders for the Perfects or had cancelled such orders. *Id.* ¶¶ 395, 398-400. Electrolux has submitted affidavits and deposition testimony from each of the eight individuals identified by Imig and asserts on the strength of that evidence that the alleged statements were never made. With one exception, Imig does not contest Electrolux's conclusion. Seven of the individuals explicitly disavowed hearing the statements or changing purchasing decisions because of the statements. *Id.* ¶¶ 405-06, 410-11, 414-15, 420-23, 425-26, 429-30, 451. The eighth individual claimed that he had heard the challenged statements from his customers and other sources, but did not claim that he had heard them from Electrolux and could not identify any of the sources. *Id.* ¶¶ 442-52. Imig characterizes this individual's statements as supporting its position but adduces no other evidence. Pl. Resp. ¶ 442.

B.  Procedural History

Imig commenced this action against Electrolux on January 28, 2005. DE 1. Less than a month thereafter, Electrolux filed its answer, asserting several counterclaims against both Imig and its distributor, Nationwide. DE 5. I&N answered those counterclaims on March 12, 2005. DE 10. On November 20, 2005, the parties consented to have a magistrate judge conduct all proceedings in this case and to order the entry of judgment pursuant to 28 U.S.C. § 636(c)(1). DE 23.

II.    <u>Discussion</u>

A.    <u>Summary Judgment</u>

Summary judgment is proper "when, after reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43 (2d Cir. 2000) (citing Fed. R. Civ. P. 56(c); *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998)); *see Celotex v. Catrett*, 477 U.S. 317, 322 (1986). At this phase of the litigation, a court's task does not extend to issue resolution; the inquiry must be tailored accordingly to discern whether material factual issues exist to be tried. *PGC Property v. Wainscott/ Sagaponack Property Owners, Inc.*, 250 F. Supp. 2d 136, (E.D.N.Y. 2003) (citing *Gallo v. Prudential Residential Servs. Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994)). Factual disputes are material and will prevent the entry of summary judgment only if, under the governing substantive law, they would affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Two characteristics of the relevant substantive law create reason for caution here. First, the standard for liability in a trademark infringement action is a "probability" of confusion – not merely a "possibility" – and summary judgment is appropriate only where the undisputed evidence could support only one conclusion. *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 482 (2d Cir. 1996). Second, intent is at issue in a suit under the Lanham Act and therefore summary judgment motions should be examined carefully. *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 61 (2d Cir. 2000) (citing *Resource Developers, Inc. v. Statute of Liberty – Ellis Island Found., Inc.*, 926 F.2d 134, 141 (2d Cir. 1991)). Nevertheless, the "mere incantation" of disputed intent cannot fend off summary

judgment if "only speculative allegations are offered ... after ample opportunity to engage in relevant discovery." *Resource Developers, Inc.*, 926 F.2d at 141.

Electrolux seeks summary judgment on each of the claims brought in this litigation, while Imig seeks summary judgment only on Electrolux's counterclaims. I consider each motion independently, drawing all inferences in favor of the non-moving party, and discuss each in turn. *Morales v. Quintel Ent'ment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

      B.      <u>Electrolux's Motion</u>

            1.      <u>Trade Dress Infringement</u>

                  a.      <u>Federal Law</u>

Section 43(a) of the Lanham Act prohibits the use of "any word, term, name, symbol, or device, or any combination thereof" against imitation in a manner that is "likely to cause confusion ... as to the origin, sponsorship, or approval" of goods. 15 U.S.C. § 1125(a). The Lanham Act's regime of protection for trademarks and trade dress serves an insulating function, protecting manufacturers of socially desirable products from the kind of imitation that "capitaliz[es] on a consumer's inability quickly to evaluate the quality of an item offered for sale." *Qualitex Co. v. Jacobson Prods Co., Inc.*, 514 U.S. 159, 163 (1995). This aim must be balanced, however, with the social benefits that can flow from some forms of imitation – for example, the sort that operates to prevent an innovator from obtaining a monopoly over features that improve the product for practical reasons – and thus, such protection should be granted only where it will promote competition. *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 28-29 (2001). Invitations to extend trade dress protection to the specific configuration of a product's features must be viewed with special caution because of the risk presented: protecting ordinary product designs would be tantamount to creating a monopoly in the actual goods. *Wal-*

*Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 213 (2000) ("Consumers are aware of the reality that, almost invariably, even the most unusual of product designs – such as the cocktail shaker shaped like a penguin – is intended not to identify the source, but to render the product itself more useful or more appealing.").

The likelihood that the primary function of a product's design is more useful than symbolic mandates a heightened standard of proof. To prevail on an action for trade dress protection of a product's design, a party must make a two-part showing: "(1) that the mark is distinctive as to the source of the good, and (2) that there is a likelihood of confusion between its good and the defendant's." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001). To be deemed differentiable from goods produced by other manufacturers, and therefore "distinctive," a product design must be nonfunctional and must contain characteristics that, over time, come "to identify and distinguish the goods – *i.e.*, to indicate their source[.]" *Qualitex Co.*, 514 U.S. at 163 (internal quotation marks omitted). Functionality is statutorily presumed; a party seeking trade dress protection under the Lanham Act thus bears "the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1123(a)(3). To do so, the party must show that the product design – or at least, the elements thereof that purportedly comprise the trade dress – is not "essential to the use or purpose of the article" and does not "affect[] the cost or quality of the article[.]" *TrafFix Devices, Inc.*, 532 U.S. at 32-33 (quoting *Qualitex*, 514 U.S. at 165); *see Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982). Moreover, to the extent that the primary purpose of any feature is aesthetic the design must be deemed functional "if the right to use it exclusively would put competitors at a significant non-reputation-related disadvantage." *Yurman*, 262 F.3d at 116 (quoting *TrafFix Devices, Inc.*, 532 U.S. at 32-33) (internal quotation marks omitted); *see Qualitex*, 514 U.S. at 170; *Eliya, Inc. v.*

10

*Kohl's Dept. Stores*, 2006 WL 2645196, at *3 (S.D.N.Y. Sept. 13, 2006).  The behavior of other

participants in the pertinent market is sometimes instructive; the existence of any alternative

product designs is relevant to assessing whether a feature affects cost or quality, although

decidedly not relevant after any finding of functionality.  *See, e.g.*, *Major League Baseball*

*Props., Inc. v. Salvino, Inc.*, 420 F. Supp. 2d 212, 222 (S.D.N.Y. 2006).  Once deemed

functional, a product's design is not a protectable trade dress and any secondary meaning the

design might have acquired is irrelevant.  *TrafFix Devices, Inc.*, 532 U.S. at 33.  If the court

deems a product's design to be non-functional, however, its inquiry turns to assessing whether

the design possesses "secondary meaning" – in other words, whether the particular configuration

of features has come, over time, to identify the source of the product in the minds of consumers.

*Qualitex*, 514 U.S. at 163 (citing *Inwood Labs., Inc.*, 456 U.S. at 856 n.11).

        In addition to establishing the distinctiveness of product design, a party must demonstrate

that the allegedly infringing product is likely to confuse consumers about the source or identity

of the product.  *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 118-19

(2d Cir. 2001).  Critical to such analysis are eight so-called "*Polaroid* factors."  *See Polaroid*

*Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  Those factors are

> (1) strength of the plaintiff's trade dress; (2) similarity of the trade dresses; (3) proximity
> of the products in the marketplace; (4) likelihood that the plaintiff will bridge the gap
> between the products (enter a market related to that in which the defendant sells its
> product); (5) evidence of actual confusion; (6) the defendant's bad faith; (7) quality of the
> defendant's product; and (8) sophistication of the relevant consumer group.

*Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005) (quoting

*Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004).  The court's task

is to weigh these enumerated factors with an eye to the ultimate question:  whether, taken as a

whole, there is a likelihood of consumer confusion with respect to the protectable product and the product charged with unlawful infringement. *Nora Beverages, Inc.*, 269 F. 3d at 119.

For the reasons set forth below, I deny summary judgment on Electrolux's claims for trade dress infringement with respect to the design of its Sanitaire vacuums.[6] Specifically, I find that genuine issues of material fact exist as to: (1) whether the Sanitaires' design affects their cost or quality; (2) whether consumers identify the particular configuration of features proposed by Electrolux as the Sanitaires' trade dress with a specific source; and (3) whether the Perfect vacuum cleaners are so like the Sanitaires that a reasonable probability exists that consumers would be confused as to the source of the Perfects.

### i.    Distinctiveness Of The Product Design

The test for functionality is disjunctive: it exists if the design is either essential to the use or purpose of the product or affects the cost or quality of the product. *TrafFix Devices, Inc.*, 532 U.S. at 32-33. To be protectable, the trade dress as a whole must be nonfunctional; the functionality of its constituent parts does not necessarily defeat this finding. *Id.* According to Electrolux, the Sanitaires' protectable trade dress consists of six components:

> (i) the shape of the base assembly; (ii) the use of the colors red, black and white on the base assembly and the bag; (iii) the shape, color and location of the on/off switch; (iv) the location, color scheme, and dial position settings for the height adjuster; (v) the shape, size, and chrome finish of the hood and the location thereon of the motor vents; and (vi) the font, writing, and position of the writing on the bag.

---

[6] The parties have not specified whether they believe this case presents a product-design or product-packaging issue; I conclude it is the former, because the elements at issue involve actual composition of the product and not simply the manner in which it is marketed. *See Wal-Mart Stores, Inc.*, 529 U.S. at 215. More significantly, the parties confine themselves to theories – like functionality – that derive from the line of cases explicitly and exclusively resolving product design claims.

Def. Memo. in Supp. of Mot. for Summ. J., DE 45 ("Def. Memo.") at 7. I&N have conceded that the Sanitaires' trade dress – as characterized by Electrolux – is not essential to the use or purpose of the vacuums. Pl. Resp. ¶ 73. Accordingly, the eligibility of the Sanitaires' design for protection turns on whether Electrolux can demonstrate that the particular combination of six features it identifies as the product's design has no measurable effect on the cost or quality of the vacuums. *See Cartier v. Samo's Sons. Inc.*, 2005 WL 2560382 (S.D.N.Y. Oct. 11, 2005) (citing *Stormy Clime, Ltd. v. Progroup, Inc.*, 809 F.2d 971, 975 (2d Cir. 1987)).

There is some evidence that the configuration of the Sanitaires is related to the overall quality of the machines. *See*, *e.g.*, Pl. Resp., Ex. C. (Hampton Dep. 15:13-16:11, Sept. 15, 2006) (shape of Sanitaires' base assembly designed for functional purposes). Similarly, there is some evidence that the phrase "heavy duty commercial" on the bag serves a descriptive function. Pl. Resp., Ex. G. (Hoare Dep. 77:4-22, Nov. 1, 2005). Much of the remaining evidence submitted on the issue of functionality pertains to Electrolux's primary argument: that the existence of alternative feasible designs proves that the Sanitaires' trade dress is nonfunctional and that no significant detriment to competition would flow from granting protection under the Lanham Act.

Evidence of alternative designs may, in some limited circumstances, be relevant to the issue of functionality, but such evidence alone generally does not suffice as a defense. *See General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405 (6th Cir. 2006) ("[i]f a trade dress is found to be functional, the mere fact that there are other non-infringing designs which would serve the same functional purpose is no defense to functionality."). The burden is on the party seeking protection to demonstrate that its product design has a source-identifying function in the first instance. *See Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d

13

535, 549 (S.D.N.Y. 2003) (citing *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1008-09 (2d Cir. 1995)). Put another way, the fact that a competitor could manufacture a comparable product with a different design has minimal bearing on the question of whether the product design for which protection is sought is inextricable, in the mind of the consumer, with identification of the product's source. For certain products, multiple designs are possible – but the only designs eligible for protection under the Lanham Act are those that for non-functional reasons have acquired distinctiveness. Protection for other designs, whether functional or insufficiently distinctive, comes too near a monopoly in the products themselves. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997). Electrolux has failed to demonstrate that the Sanitaires' trade dress is non-functional as a matter of law. Accordingly, I turn to the issue of secondary meaning to determine whether the trade dress has acquired distinctiveness within the meaning of the law.

Secondary meaning turns on whether "the public is moved to consume a product because of its source." *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 564 (2d Cir. 1990). Six elements are probative of whether in the mind of the "consuming public for a particular product" the product is associated with its source because of the trade dress: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1071 (2d Cir. 1995) (quoting *Centaur Comms, Ltd. v. A/S/M Comms., Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987) (internal quotation marks omitted)). This is an "essentially factual determination, proof of which entails vigorous evidentiary requirements." *Bristol-Myers Squibb*

*Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992) (internal quotation marks and citation omitted).

Electrolux has submitted a survey of 157 participants to support its claim that the configuration of six features serves the function of identifying the source of the Sanitaires and thus possesses secondary meaning. Def. Stmt. ¶¶ 36-72. Consumer surveys are a probative form of evidence on the issue of secondary meaning, but they are not conclusive. *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 949-50 & n.2 (2d Cir. 1981) (fifty percent of a 500-person survey identified source based on trade dress). Of the 157 participants in Electrolux's survey, 118 identified one or more of the six relevant features as signifying that the vacuum cleaner was a Sanitaire – none identified all six, let alone the particular configuration of all six features. *Id*. In fact, some two-thirds of those 118 participants cited the "red color" as the reason for identifying the vacuum cleaner as a Sanitaire. *See* Def. Stmt., Ex. 20 at 17. No probative weight can attach to a survey that does not demonstrate the symbolic function of the product design, overall, with respect to the source of the product. This survey falls well short of providing sufficient evidence on which to conclude that the design of the Sanitaires has secondary meaning as a matter of law. Electrolux has submitted no other evidence on the issue of distinctiveness and thus, factual disputes remain.

ii.     Likelihood Of Confusion

None of the eight *Polaroid* factors need be dispositive, but any one of them may be; accordingly, the court must carefully evaluate each factor with respect to the particular case. *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995). The organizing principle for the court's inquiry is whether the moving party has shown a probability that consumers will

be confused as to the source of the purportedly infringing product. *Nora Beverages, Inc.*, 269 F.3d at 121. I discuss each factor in turn.

Strength of the moving party's trade dress. The "strength of a particular [trade dress] encompasses the totality of the product in the relevant commercial context." *Nora Beverages, Inc.*, 269 F.3d at 122. A trade dress is strong if it possesses characteristics that closely associate the product with a specific source in the eyes of the public. *Sports Auth. v. Prime Hospitality Corp.*, 89 F.3d 955, 960-61 (2d Cir. 1996). Commercial realities can be determinative; an otherwise protectable trade dress can lack sufficient strength if the party seeking protection has authorized others to use it. *Nora Beverages, Inc.*, 269 F.3d at 123 (citing *Versa Prods. Co. v. Bifold Co. (Mfg.) Ltd.*, 50 F3d 189, 216 (3d Cir. 1995) (private labeling undermines strength of mark)).

Electrolux produces another line of vacuum cleaners, the Powr-Flite series, with a design that is virtually identical to the design of the Sanitaires. It sells these vacuums to distributors to resell under their own respective brands. The more that the market is populated with vacuum cleaners designed like the Sanitaires, the less likely consumers will be to associate the Sanitaires' trade dress with a single source. The strength of the Sanitaires' trade dress is diluted accordingly.

Similarity of the trade dresses. To apply this *Polaroid* factor, I "must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006) (internal quotation marks and citations omitted). Side-by-side comparison of the trade dresses at issue is permissible, but not to the exclusion of considering the "overall impression" that consumers are likely to have of

the products "when they are viewed sequentially, and in different settings, rather than simultaneously." *Louis Vuitton Malletier v. Burlington Coat Factory*, 426 F.3d 532, 539 (2d Cir. 2005). Prominently displayed source-identification, such as a label, can negate any confusion as to the source of marks that might otherwise be similar. *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46-47 (2d Cir. 2000) (collecting cases).

With respect to the six features Electrolux identifies as the Sanitaires' trade dress, some similarities between the Perfects and the Sanitaires are undeniably present. For example, both models of both vacuums have chrome hoods and similarly located height adjustment and power switches. Nevertheless, whether viewed side-by-side or sequentially in different conditions, the overall impression of the two brands is not confusingly similar as a matter of law. Where the Sanitaires are red, the Perfects are dark blue or black. More significantly, the brand name of each vacuum cleaner appears on the front of the base assembly. Thus, where the Sanitaires say "Sanitaire" in lower-case white lettering with a red symbol to the left of the word, the Perfects say "PERFECT" in upper-case black lettering with an American flag to the left of the word. *Id.* Taken as a whole, a reasonable fact-finder could conclude that these differences prevent the similarities between the Sanitaires and the Perfects from confusing consumers about the respective sources of the machines. But this conclusion is not inescapable, and summary judgment is therefore not appropriate.

Proximity of the products in the marketplace. Evaluation of the products' proximity in the marketplace requires assessment of "whether and to what extent the two products compete with each other and the nature of the products themselves and the structure of the relevant market." *Morningside Group Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 140 (2d Cir. 1999). Like the Sanitaires, the Perfects are heavy duty commercial vacuum cleaners. They

17

are sold for similar purposes.  Def. Stmt. ¶ 187.  The record is devoid of any evidence on the

structure of the relevant market.  Nevertheless, to the extent that the Sanitaires and the Perfects

are sold by the same distributors – which seems probable, since Nationwide itself sells both

brands, Def. Stmt. ¶¶ 185-86, 191 – they are undeniably in some degree of proximity.  Without

more, I have no basis for assessing the import of any proximity with respect to consumer

confusion.

      <u>Bridging the gap</u>.  A likelihood that the two products will "bridge the gap" between

markets such that they compete in the same market can be probative of the probability that

consumers will be confused as to the source of each product.  Electrolux and I&N are already in

direct competition, and thus, this factor has no applicability here.

      <u>Evidence of actual confusion</u>.  Parties may submit anecdotal evidence of actual consumer

confusion – or the lack thereof – between the two products at issue, but more than *de minimis*

evidence is required to raise a triable issue of fact.  *Nora Beverages, Inc.*, 269 F.3d at 124.

Neither party has submitted evidence on this point and Electrolux argues that it is irrelevant.

Def. Memo. at 32 n.36.  I disagree.  Although the record contains little information about the

relevant market, the fact that the vacuums are designed and marketed for commercial use

suggests a relatively smaller and more specialized market – and perhaps more discerning

consumers – than might be relevant to a case involving, for example, vacuums designed for use

in the home.  Evidence of actual confusion, particularly among actual consumers, can be highly

probative on this and other factors where the marketplace is not large.  *See Morningside Group

Ltd.*, 182 F.3d at 143.

      <u>Good faith</u>.  Consistent with the overall purpose of trade dress protection, analysis under

this factor centers on whether the non-moving party adopted the challenged trade dress

deliberately to exploit the moving party's goodwill and reputation. *Nora Beverages, Inc.*, 269 F.3d at 124-25 (quoting *Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991)). Intentional imitation does not necessarily indicate bad faith, except to the extent that it involves a "confusingly similar" trade dress or other behavior suggesting purposeful deception. *Id.*

There is no dispute that Imig deliberately copied some features of the Sanitaires' design. Def. Stmt. ¶ 109; Pl. Resp. ¶ 109. Imig's patent counsel commissioned a patent search with respect to the Sanitaires specifically, explaining that Imig "wishes to make a private label vacuum cleaner that is virtually identical in appearance (and perhaps also mechanically identical) to the [Sanitaires]." Def. Stmt., Ex. 32. The Chinese manufacturer with whom Imig contracted was in possession of Sanitaires. Def. Stmt., Ex. 18 (Mark Genoa Dep. 115-16). Imig never provided a design or any prototypes to the manufacturer, instead directing the manufacturer to produce a vacuum cleaner with specific features identified by the Genoa brothers, including features culled from the Sanitaires. *Id.*

There is no evidence that I&N intended to deceive consumers as to the source of the Perfect vacuums. Rather, to the extent that I&N's advertisements for the Perfects are based on a comparison with the Sanitaires and the exhortation to "Accept No Substitutes" as discussed below, they arguably intended exactly the opposite. Moreover, while the Perfects and the Sanitaires are unquestionably similar in some respects – as they were intended to be – there is a triable issue of fact as to whether the vacuums were "confusingly" similar.

Quality of the non-moving party's product. Inferior quality of the purportedly infringing product increases the threat of reputational harm to the movant. *Morningside Group Ltd.*, 182 F.3d at 142. If consumers confuse the non-moving party's product with that of the movant, they are likely to assign fault for any flaws in the infringing product to the movant. *Id.*

Electrolux presented evidence of significant quality problems with the Perfects. Specifically, there were cracks in the base assembly and the motor fan, problems with the bag, and the motors on the replacement parts lacked thermostats. Def. Stmt. ¶¶ 195-203. I&N concede that these quality problems existed, but maintain that they were confined to the "initial shipment" and have been remedied as to all subsequent shipments. Pl. Resp. ¶¶ 195-203. The problems were so severe that several of I&N's customers returned all purchased vacuums. Def. Stmt. ¶¶ 205-13; *see* Pl. Resp. ¶¶ 205-13 (uncontested). I&N concede that they were obliged to accept 40 percent of the Perfects as returns. Def. Stmt. ¶ 214; *see* Pl. Resp. ¶ 214 (uncontested).

This evidence unquestionably illustrates significant quality problems with the Perfects. There is, however, no indication that any of I&N's consumers were the least bit confused about the source of the vacuums. Complaints were made directly to I&N, as were returns, and there is no evidence of any consumers mistakenly attributing the Perfects' flaws to Electrolux. Def. Stmt. ¶¶ 205-12. This factor, too, presents genuine issues of material fact.

Sophistication of consumers. There is direct correlation between the probability of consumer confusion and the level of consumer sophistication, except where the similarities between the trade dresses are quite pronounced. *Morningside Group Ltd.*, 182 F.3d at 142-43. In the latter instance, evidence of actual confusion among even the most sophisticated consumers can support a finding of an overall likelihood of confusion. *Id.*; *Keystone Mfg. Co., Inc. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 559 (W.D.N.Y. 2005). Neither party presented evidence on this factor, and Electrolux has inexplicably downgraded this factor to a subcategory of the quality factor. Def. Memo. at 32 n.36. I decline to speculate on the sophistication among consumers in the relevant market. My caution in this regard is heightened by the absence of any

basis upon which to establish the relevant market in the first instance. Thus, the fact-finder must assess the significance of this factor, if any.

*     *     *

The preceding analysis of the *Polaroid* factors suggests that summary judgment would be inappropriate even if there were no triable issue of fact with respect to the distinctiveness of the Sanitaires' trade dress. A reasonable jury could reach any number of conclusions based on the evidence now before me, including the matter of the relative weight of each factor. For the reasons above, Electrolux's motion for summary judgment on its trade dress infringement claims under the Lanham Act is denied.

### b.    New York Law

Electrolux refers, in passing, to the test for trade dress infringement under the law of the State of New York but devotes no portion of its brief to its claims under that law. Def. Memo. at 31 n.31. New York law requires an analysis of trade dress infringement claims that is similar to the analysis of those claims under the Lanham Act. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006) (citing *Louis Vuitton Malletier v. Burlington Coat Factory, Inc.*, 426 F.3d 532, 539 n.5 (2d Cir. 2005)).

As a type of unfair competition, trade dress infringement claims under New York state law turn on "the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 408 (2d Cir. 1997) (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995). In addition to proving bad faith, a party seeking damages must demonstrate actual confusion, and a party seeking injunctive relief must show a likelihood of confusion – a party seeking a combination of damages and injunctive

21

relief must make both of the latter showings.  *Jeffrey Milstein, Inc.*, 58 F.3d at 35.  Electrolux

has shown none of these factors, as discussed above, and I therefore deny its motion for

summary judgment on its state law claims.

2.    False Advertising

Electrolux seeks summary judgment on its false advertising claims under both federal

and state law.  The statements at issue were contained in I&N's print advertisements for the

Perfects, and include assertions about the quality of the Perfects – independently and in

comparison with the Sanitaires – and that "tests prove" the claims specific to the Perfects' motor

life and amperage.  Specifically, the ads claim:  (1) that the Perfects have a 9.5 amp motor; (2)

that the 9.5 amp motor is 30% stronger than "nearest competitors"; and (3) the Perfects are ETL

listed.  Def. Stmt., Ex. 51-53.  Additionally, one advertisement explicitly compares the Perfects

with the Sanitaires, urging readers to "Accept No Substitutes."  *Id.* Ex. 53.  This flyer makes

several assertions about the purported superiority of the Perfects, claiming that the Perfect P101

"is built with a Motor Rating of 9.5 Amps and Motor Life over 1,000 hours" and bearing an

"ETL listed" logo.  *Id.*  More directly, the flyer claims that where the P101's motor is "9.5 amps

(ETL listed)" the Sanitaire 886's motor is "7.0 amps (UL Listed)" and that the P101's motor life

is "over 1,050 (w/2 Carbon Brush Changes)" while the 886's is "??????"  *Id.*  Electrolux seeks an

injunction that would prevent I&N from false communications about the Perfects, oblige I&N to

instruct distributors of the Perfects to cease any such false communications, and to retract their

statements in a public manner.  For the following reasons, I grant summary judgment as to I&N's

liability for violations of the Lanham Act, reserving adjudication of the scope of appropriate

relief, and deny summary judgment as to I&N's liability under New York law.

a.     <u>Federal Law</u>

The Lanham Act expressly prohibits "any false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities" of goods produced by either the moving party or its opponent.  15 U.S.C. § 1125(a)(1)(A)-(B); *Societe des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 132 (2d Cir. 2004).  The court's analysis of claims for violations of this ban on false advertising must be conducted with an eye to the overall impression created by the challenged advertising or promotion; the court should not engage in "disputatious dissection."  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997).  To prevail, the moving party must establish that the challenged claims misrepresent an "inherent quality or characteristic of the product" and that the claims are false; the latter must be proved through evidence that the claims are "literally false as a factual matter" or else that, while true, the advertisement "is likely to deceive or confuse customers."  *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) (quoting *Nat'l Basketball Ass'n*, 105 F.3d at 855). The nature of proof required varies based on the nature of the advertisement.  If the challenged advertisement represents that the product advertised is superior to products made by others, a moving party must "affirmatively prove [the non-moving party]'s product equal or inferior" to its own.  *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1992).  On the other hand, if the challenged advertisement asserts that "tests prove" its claims about the superiority of its product, the moving party need only show that the tests "did not establish the proposition for which they were cited" – for example, by showing that the tests were not "sufficiently reliable" to prove that proposition.  *Id.*  If no tests exist, such claims are false as a matter of law.  *See Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 2004 WL 896952, at *8 (E.D.N.Y. Mar. 26, 2004);

23

*see also Novartis Consumer Health, Inc. v. Johnson & Johnson - Merck Consumer Pharmaceuticals, Co.*, 290 F.3d 578, 590 (3d Cir. 2002).

Electrolux has submitted evidence sufficient to establish that all of I&N's claims about the Perfects' motor life and power are literally false. As discussed above, the ETL tests revealed that the amperage of the Perfects is 7.4 amperes, not 9.5 amperes as I&N claimed, and that the Perfects were not ETL listed. Moreover, Electrolux conducted its own set of tests in a certified facility on the Perfects, which revealed that the median motor life for the Perfects was 326 hours. Def. Stmt. ¶¶ 370-89. Electrolux tested the motor life of the Sanitaires; the median was 999 hours. *Id.* ¶ 383. Obviously, 326 hours is not 3 times longer than 999 hours. I&N do not contest that the Sanitaires are a "nearest competitor" of the Perfects. Pl. Resp. ¶ 218; Def. Stmt. ¶ 218. Further, Electrolux tested the overall amperage of the Sanitaires and confirmed that it is 7.0 amps. Def. Stmt. ¶ 385. The actual amperage of the Perfects, 7.4 amps, is decidedly not 30 percent more than that of the Sanitaires. Thus, I&N's comparative advertising claims – that the Perfects are 30 percent stronger with a motor life 3 times longer than nearest competitors – are literally false.

I&N have offered absolutely no evidence to support the claims listed above. Indeed, they have scarcely bothered to contest these claims, confining themselves instead to the argument that because they do not now publish the challenged claims, they cannot be held liable for their falsity. Pl. Resp. ¶¶ 215-227. Their argument is specious: a party's voluntary cessation of unlawful behavior does not absolve it of liability for what it has already done. I&N declare that the Perfects' motor life was tested at the Chinese factory, under Scott Genoa's supervision. Pl. Resp. ¶¶ 360-62, 365. I&N failed to provide any test results or any information about any

24

such tests, relying instead on Mr. Genoa's unsworn statement, and consequently fail to raise a genuine factual dispute.

Electrolux has sufficiently demonstrated that the challenged claims are literally false as a matter of law. I therefore grant summary judgment on Electrolux's motion on its false advertising claims under federal law.

b. New York Law

Deceptive acts or practices and false advertising are expressly prohibited by Sections 349 and 350 of New York's General Business Law. To prevail on a claim under either statute, the moving party must show that: "(1) the [non-moving party's] deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the [moving party] has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521-22 (2d Cir. 2000) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995)); *see Verizon Directories Corp. v. Yellow Book U.S.A., Inc.*, 309 F. Supp. 2d 401, 405 (E.D.N.Y. 2004) (collecting cases). The two sections differ somewhat with respect to the third prong: while a party must demonstrate actual injury to prevail under either section, "actual reliance" is an element of a claim under Section 350 but is unnecessary for one brought under Section 349. *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 & n.4 (2d Cir. 2003) (citing *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000)).

I&N's advertisements were unquestionably "consumer-oriented" conduct. *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996). As discussed above, each of the challenged claims was materially misleading. However, Electrolux has failed to produce any evidence of injury, let alone injury that occurred as a result of the challenged

advertisements, and thus fails to satisfy its burden.  I therefore deny summary judgment on Electrolux's claims for false advertising under New York law.

### 3.    Copyright Infringement

Electrolux charges I&N with violating the Copyright Act of 1974 in connection with the Owner's Guide that accompanied at least the first shipment of Perfects.  I&N concede – and the record makes plain –  that the challenged Owner's Guide was a verbatim reproduction of the Sanitaires' Owner's Guide.[7]  Def. Stmt. ¶¶ 120-26; Pl. Resp. ¶¶ 120-26.  For the following reasons, I grant Electrolux's motion for summary judgment on its copyright claims.

Summary judgment is proper where the moving party establishes:  (1) that the party owns a valid copyright; and (2) that the non-moving party has copied the copyrighted work without authorization.  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2004) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  The second element has been met when a party shows that the portion copied is an "improper or unlawful appropriation[;]" that it is the product of "actual copying" (through direct evidence or indirect evidence demonstrating that the person accused of copying had a "reasonable possibility" of access to the copyrighted material); and that it bears a "substantial similarity" to the copyrighted work. *Jorgensen*, 351 F.3d at 51; *Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001); *Streetwise Maps v. VanDam, Inc.*, 159 F.3d 739 (2d Cir. 1998).  Where similarities between the two works "concern details of such an arbitrary character" that the likelihood of independent and non-culpable duplication is minimal, "an inference of copying may be drawn without any additional

---

[7] I&N confine their concession to the first "400 [sic]" Perfects sold and they argue that they have since discontinued the offending Owner's Guide.  Pl. Resp. ¶ 120; Pl. Opp'n to Def. Mot. for Summ. J., DE 47 ("Pl. Opp'n") at 9.  These arguments have little relevance to the question of I&N's liability for copyright infringement.

evidence ... [and] it is more straightforward to say that in some cases proof of access isn't required." *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 926 (7th Cir. 2003) (citing, *inter alia*, *Gaste v. Kaiserman*, 863 F.2d 1061 (2d Cir. 1988) (other citations omitted)).

For a reasonable fact-finder, the conclusion that I&N violated the Copyright Act would be inescapable. Electrolux has produced a Certificate of Registration, TX 6-079-015, dated January 21, 2005, from the United States Register of Copyrights.[8] Such a registration is *prima facie* evidence of valid ownership of a copyright, and I&N have not rebutted it with any factual evidence. 17 U.S.C. § 410(c); *Jorgensen*, 351 F.3d at 51. Additionally, I&N do not contest that the Sanitaires' Owner's Guide and the Perfects' Owner's Guide are "virtually identical." Def. Stmt. ¶¶120-26, 128; Pl. Resp. ¶¶ 120-26, 128. This admitted "substantial similarity" between the two works has probative value as a proxy for direct evidence of actual copying – by negating the possibility that the purported infringer independently developed the challenged work – as well as establishing a threshold level of similarity for purposes of assessing I&N's liability. *See, e.g.*, *Hogan v. DC Comics*, 983 F. Supp. 82, 85-87 (N.D.N.Y. 1997). The six examples Electrolux identifies include verbatim reproduction not only of the text of the Sanitaires' Guide but also arbitrary details like the term "Edge Kleener," Def. Stmt. ¶ 125, the illustrations accompanying instructions, and capitalization of particular phrases. Def. Stmt. ¶¶ 120-26, *id.* Ex. 37, 38.

---

[8] Electrolux's predecessor in interest, National Union Electric, secured the registration for the original Owner's Guide, from which the Owner's Guide covered by the TX 6-079-015 was derived. Moreover, National Union Electric, and subsequently The Eureka Company – with which Electrolux merged in 2002, Def. Stmt. ¶¶ 1-7 – secured registrations for all subsequent derivatives of the Owner's Guide. Def. Stmt. ¶¶ 83-93. As such, Electrolux need not produce a separate registration for each of the pre-existing works. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 747 (2d Cir. 1998).

Further, Electrolux has demonstrated circumstantially that I&N had access to the Sanitaires' Owner's Guide. There is no dispute that Nationwide was a distributor for the Sanitaires, which by itself suggests access to the Owners Guides with which they were sold. In addition, the record demonstrates that Imig knew enough about the Sanitaires to be able to instruct the Chinese manufacturers to imitate particular features of those vacuums in particular (as well as other vacuums) in manufacturing the Perfects. Finally, the fact that Imig directed the manufacture of replacement parts that would be interchangeable with Sanitaire parts also suggests access to technical information that must have included the manuals.

I&N seek to defend against liability by arguing that they were wholly oblivious to any copying of the Sanitaires' Owner's Guide and that the Chinese manufacturers undertook to reproduce the Sanitaires' Owner's Guide spontaneously for reasons of their own. Pl. Opp'n at 10. This rather counterfactual protestation is unavailing. I&N have adduced no evidence that, unlike the decision to imitate certain features of the Sanitaires, the decision to imitate the Sanitaires' Owner's Guide originated with the Chinese manufacturers. Indeed, the evidence suggests otherwise; the Genoa brothers regularly communicated their ideas to the Chinese manufacturers

during the process of developing the Perfects.  Def. Stmt. ¶ 129.[9]  In light of the foregoing,  I

grant Electrolux's motion for summary judgment on its copyright infringement claims.

### 4. <u>Imig's Claims</u>

Imig's complaint asserts five claims for relief under federal and state law on which

Electrolux seeks summary judgment.  The facts underlying each claim are essentially identical.

Imig's complaint alleges that Electrolux on several occasions contacted various distributors and

wholesalers in their shared industry and made certain false statements.  Complaint, DE 1 ¶¶ 29-

39.  Specifically, Imig charges Electrolux with stating that:  (1) the Perfects infringe Electrolux's

rights; (2) Electrolux would sue anyone who bought the Perfects along with I&N; (3) Electrolux

had already sued Imig.  *Id.* ¶¶ 30-31.  Imig claims that the statements interfered with its business

relationships and depressed its sales, causing imminent and actual financial damages, and

harmed its goodwill and reputation. *Id.* ¶¶ 39, 46, 55, 62-64.  During the course of discovery,

Imig identified three individuals who allegedly heard the challenged statements directly from

Electrolux employees, and two individuals who allegedly heard the challenged statements

---

[9]  In addition, during the course of discovery, it became evident that I&N had failed to comply
with their obligations under the Federal Rules of Civil Procedure.  Specifically, I&N completely
failed to produce relevant discoverable evidence in response to Electrolux's proper document
demands and indeed, allowed a substantial amount of that evidence to be deleted from their hard
drives.  This forced Electrolux to incur expenses by obtaining mirror images of the hard drives of
I&N's computers – pursuant to my Order dated July 21, 2005, DE 21 – and employing an expert
to conduct forensic analysis to recover data that should have been preserved and produced.
Using information gleaned from that analysis, Electrolux has shown that a substantial portion of
the evidence pertained to the relationship between I&N and the Chinese manufacturers, and was
favorable to Electrolux's position on various claims.  Def. Stmt. ¶¶ 129-163.  I&N do not
meaningfully contest that they destroyed relevant documents.  Pl. Resp. ¶¶ 129-63.  I&N's
conduct in this regard justifies an adverse inference, *see Residential Funding Corp. v. Degeorge
Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002), that would warrant holding them vicariously
accountable for the Chinese manufacturers' actions in copying the manuals.  *See Metro-
Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("One ... infringes
vicariously by profiting from direct infringement while declining to exercise a right to stop or
limit it." (citation omitted)).

second-hand from others in the industry.  Def. Stmt., Ex. 90.  Imig also identified five business relationships as suffering harm, purportedly because of the challenged statements.  *Id.*

Electrolux has submitted affidavits or deposition testimony from each of the people Imig identified:  Tim Weiner, Harold Hogue, Vaughn Smith, Allen Randolf, Don Merritt, Brian Anderson, Ken Strauss and Howard Levine.  Def. Stmt., Ex. 91-97.  Each disavowed hearing anything other than – at most – "rumors from other individuals in the vacuum cleaner industry" about acrimony between Electrolux and Imig; and each declared that these rumors had "no impact on any of [their] purchasing decisions."  Def. Stmt., Ex. 91 ¶¶ 4-5; *id.* Ex. 92 ¶¶ 3-4; *id.* Ex. 93 ¶¶ 7-9; *id.* Ex. 94 ¶ 3 (noting ongoing purchases from Imig); *id.* Ex. 95 ¶¶ 3-4; *id.* Ex. 96 ¶¶ 3-4; *id.* Ex. 99 (Strauss Dep. 31:12-32:24).  Mr. Anderson "categorically" declared that he never promised to purchase any Perfects, and moreover that he never intended to purchase them. *Id.* Ex. 97 ¶¶ 3-4; *see also id.* Ex. 98.

Rumors in the industry – no matter how specific – have no evidentiary significance. Imig has submitted no evidence at all, let alone any evidence to demonstrate a factual dispute, resting instead on conclusory statements.  I grant summary judgment in favor of Electrolux on Imig's claims for false advertising under federal and state law, tortious interference with business relations under New York law, commercial disparagement under New York law, and *prima facie* tort under New York law because no reasonable fact-finder could conclude on the record currently before me that any of the alleged statements were actually made.

### a.    False Advertising

I have set out the standards for false advertising under federal and state law above, and do not repeat them here.  The bedrock of a claim for false advertising under either federal or state law is that a statement has been made or that some kind of message has been disseminated.

*See, e.g.*, *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002); *Maurizio v. Goldsmith*, 230 F.3d 518, 521-22 (2d Cir. 2000). Absent admissible evidence of such a statement, no reasonable fact-finder could find that Electrolux had violated federal and state prohibitions on false advertising.

### b. Tortious Interference With Business Relations

Under New York law, a claim for tortious interference with business relations is comprised of four elements; the plaintiff must prove: "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *State Street Bank & Trust v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171 (2d Cir. 2004) (citations omitted); *NBT Bancorp Inc. v. Fleet/ Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 622 (1996). Thus, the degree to which the plaintiff's relationship will be protected depends in significant part on its substance; a prospective relationship, in which the plaintiff has only speculative interest, will be protected very little in comparison with an actual contractual relationship, in which both parties have substantive rights. *Id.* Further, the plaintiff must "demonstrate *both* wrongful means *and* that the wrongful acts were the *proximate cause*" of the harm to the relationship, or the claim fails. *State Street Bank & Trust*, 374 F.3d at 171 (quoting *Pacheco v. United Medical Assoc., P.C.*, 759 N.Y.S.2d 556, 559 (N.Y. App. Div. 2003)) (emphasis in original).

The evidence before me obviates any genuine issue of fact on this claim. No reasonable fact-finder could conclude that Electrolux made the challenged statements or that Imig's business relationships were affected by anything other than market forces, if indeed they were affected at all. Quite the contrary, there is conclusive evidence that each of the individuals Imig identified

31

had reached their purchasing decisions and had not altered them, notwithstanding any rumors in the industry.[10]

c.   <u>Commercial Disparagement</u>

It is axiomatic that a claim for commercial disparagement – which New York recognizes as the tort of either trade libel or disparagement of goods – rises and falls on the truth or falsity of a statement that is actually made. Restatement of Torts (Second) §§ 626, 629 (1977); *see also Fashion Boutique of Short Hills*, 314 F.3d at 59 (disparagement of goods); *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d 333, 345 (S.D.N.Y. 2000) (citations omitted) (trade libel). Here, too, evidence that Electrolux did not make the challenged statements to the people identified by Imig is dispositive.

d.   <i><u>Prima Facie</u> Tort</i>

A *prima facie* tort claim "should not become a 'catch-all' alternative for every cause of action which cannot stand on its own legs." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985) (citation omitted). The elements are "(1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful." *Id.* Electrolux has submitted evidence sufficient to show that it did not make the challenged statements, which in itself would be enough to support summary judgment on this claim. Further, there is no evidence that Imig suffered any special damages, which is a "critical element." *Id.* I therefore grant Electrolux's motion for summary judgment.

---

[10] Imig's complaint does not allege that the statements it ascribes to Electrolux had any effect on a contract, and its motion papers make no such argument. I therefore do not discuss the elements of a claim for tortious interference with contractual relations, the first of which is the existence of a valid contract. *See Scutti Enters., LLC v. Park Place Ent'ment Corp.*, 322 F.3d 211, 215 (2d Cir. 2003).

C.     I&N's Motion

I&N move jointly for summary judgment in their favor on each of Electrolux's counterclaims. For the following reasons, I deny their motion in its entirety.

1.     Trade Dress Infringement

To prevail on its motion for summary judgment on Electrolux's trade dress infringement claims, I&N must demonstrate that a reasonable fact-finder could not find that the Perfects infringed on the Sanitaires.  More precisely, as stated in greater detail above, I&N must show that as a matter of law, the Sanitaires' trade dress is not distinctive and that there is no likelihood of confusion between the Perfects and the Sanitaires.  *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).  I&N have failed to substantiate their arguments with evidence showing the absence of a material factual dispute, however, and thus have not satisfied their burden.

I&N make no argument regarding the extent to which the trade dress of the Sanitaires has acquired secondary meaning, although they argue that Electrolux's definition of its trade dress is fatally underinclusive.  They have submitted evidence purporting to show the desirability and utility of the features Electrolux designates as constituting the Sanitaires' trade dress.  Pl. Stmt. ¶¶ 6-13.  This evidence has no bearing on the source-identifying nature of the trade dress, nor is it indicative of functionality.  *TrafFix Devices, Inc.*, 532 U.S. at 32-33.  I&N cannot prevail on a motion for summary judgment without showing it impossible for a factfinder to conclude that Electrolux had satisfied its burden.

The *Polaroid* factors weigh heavily against summary judgment.  The "similarity of trade dress" factor requires consideration of the "overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers."  *Louis Vuitton Malletier v. Dooney & Burke*, 454 F.3d 108, 117

(2d Cir. 2006) (internal quotation marks and citations omitted).  Standing alone, the difference in overall color between the Perfects and the Sanitaires tells me nothing about the extent of any similarity between the two trade dresses; consumers may expect that a particular product from a single source would come in multiple colors and thus would not view the difference in overall color as source-identifying.   Further, there is a factual dispute as to the prominence with which the label "PERFECT" is displayed and its sufficiency to distinguish the Perfects from the Sanitaires in the mind of the consumers.  *See* Pl. Stmt. ¶ 17; Def. Resp. ¶ 17.  With respect to the "good faith" factor, I note that the Genoa brothers' declarations as to their subjective intent does not establish the absence of a factual dispute.  I&N have submitted no evidence with respect to the remaining factors:   strength of the trade dress; proximity of the products in the marketplace; likelihood that the plaintiff will bridge the gap between the products (*i.e.*, enter a market related to that in which the defendant sells its product); evidence of actual confusion;  quality of the defendant's product; and sophistication of the relevant consumer group.  *Nora Beverages, Inc.*, 269 F.3d at 122.  I therefore deny I&N's motion for summary judgment on these claims.

### 2.      Copyright Infringement

On the grounds that any similarities between the Perfects' Owner's Guide and the Sanitaires' Owner's Guide resulted from an inadvertence, I&N seek summary judgment exculpating them from any liability.  Even were I to credit the scarce evidence submitted in support of this contention, I would not grant summary judgment.  As discussed above, a claim of copyright infringement turns on two factors:  (1) that the party owns a valid copyright; and (2) that the non-moving party has copied the copyrighted work without authorization.  *Jorgensen*, 351 F.3d at 51.  I&N have submitted no evidence that would allow me to conclude that Electrolux could not possibly prevail on its claim.  To the contrary, as discussed above, I

conclude that no reasonable fact-finder could reach a result other than that I&N infringed on Electrolux's copyrighted Owner's Guide. I deny summary judgment accordingly.

3.     False Advertising

To the extent that I&N have moved for summary judgment on Electrolux's false advertising claims under either federal or state law, they have failed to carry their burden. The bald assertion that any false advertising "has been explained as innocent and without deceptive intent" provides no information about whether the challenged statements about the Perfects' motor life and amperage were grounded in any actual tests, or indeed any basis whatsoever. *S.C. Johnson & Son, Inc.*, 241 F.3d at 238; *Maurizio v. Goldsmith*, 230 F.3d at 521-22. I deny I&N's motion for summary judgment in their favor on Electrolux's false advertising claims.

III.   Conclusion

For the foregoing reasons, I deny I&N's motion for summary judgment in full, and I grant Electrolux's motion in part and deny it in part. Specifically,

A.     I deny the cross motions for summary judgment on Electrolux's trade dress infringement counterclaims under federal and state law (but find that Imig is liable on the federal claim, and that Electrolux need only establish the scope of its injury on that claim);

B.     I grant Electrolux's motion for summary judgment on its false advertising counterclaims under federal law, and deny I&N's cross-motion on those claims;

C.     I deny the cross motions for summary judgment on Electrolux's state law false advertising claims;

D.     I grant Electrolux's motion for summary judgment on its copyright infringement counterclaim and deny I&N's cross-motion on that claim;

E.     I grant Electrolux's motion for summary judgment on Imig's false advertisement claims under federal and state law;

35

F.      I grant Electrolux's motion for summary judgment on Imig's tortious interference claims under New York;

G.      I grant Electrolux's motion for summary judgment on Imig's commercial disparagement claims under New York law; and

H.      I grant Electrolux's motion for summary judgment on Imig's state law *prima facie* tort claims.

The parties' respective counsel shall confer as to potential trial dates on the remaining claims and the possibility of settlement and shall thereafter appear before me to discuss both matters on April 17, 2007, at 3:00 p.m.

**SO ORDERED.**

Dated:  Brooklyn, New York
        March 22, 2007

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge